## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **SAINT-GOBAIN GLASS FRANCE,** | ) | |
| | ) | |
| *Plaintiff/Counter-Defendant,* | ) | |
| | ) | |
| v. | ) | |
| | ) | **Civ. A. No. 1:06-cv-00446-JJF** |
| | ) | |
| **AUTOMOTIVE COMPONENTS** | ) | |
| **HOLDINGS, LLC,** | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

## AUTOMOTIVE COMPONENTS HOLDINGS, LLC'S MOTION TO IMPLEAD SOLUTIA, INC. AS A THIRD-PARTY DEFENDANT

Defendant, Automotive Components Holdings, LLC ("ACH"), moves the Court for leave to implead Solutia, Inc. ("Solutia") as third-party defendant and to serve on Solutia a summons and third-party Complaint.

This motion is based on the fact that Solutia is liable to defendant ACH for all of any judgment plaintiff Saint-Gobain Glass France ("Saint-Gobain") may obtain against defendant ACH as set forth in the third-party Complaint attached as Exhibit A.

CONNOLLY BOVE LODGE & HUTZ LLP


*/s/ Collins J. Seitz, Jr.*
Collins J. Seitz, Jr. (#2237)
Kevin F. Brady  (#2248)
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE  19899
Tel: (302) 658-9141

*Attorneys for Defendant/Counter-*
*Plaintiff/Third-Party Plaintiff*


OF COUNSEL:

Ernie L. Brooks   (P22875)
Frank A. Angileri  (P45611)
Brian S. Tobin  (P67621)
**BROOKS KUSHMAN P.C.**
1000 Town Center
Twenty-Second Floor
Southfield, Michigan 48075-1238
Tel:  (248) 358-4400
Fax:  (248) 358-3351
Email:  ebrooks@brookskushman.com
        fangileri@brookskushman.com
        btobin@brookskushman.com

DATED: March 30, 2007

## <u>CERTIFICATION PURSUANT TO LOCAL RULE 7.1.1</u>

I hereby certify that counsel for Automotive Components Holdings, LLC,

defendant in this action, contacted counsel for plaintiff regarding their position on the

motion.  Counsel for plaintiff stated that plaintiff is opposed to the motion.

Collins J. Seitz, Jr.

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **SAINT-GOBAIN GLASS FRANCE,** | ) |
| | ) |
| *Plaintiff/Counter-Defendant,* | ) |
| | ) |
| v. | ) **Civ. A. No. 1:06-cv-00446-JJF** |
| | ) |
| **AUTOMOTIVE COMPONENTS** | ) |
| **HOLDINGS, LLC,** | ) |
| | ) |
| *Defendant/Counter-Plaintiff/* | ) |
| *Third-Party Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| **SOLUTIA, INC.** | ) |
| | ) |
| *Third-Party Defendant* | ) |
| | ) |

## AUTOMOTIVE COMPONENTS HOLDINGS, LLC'S
## THIRD-PARTY COMPLAINT AND JURY DEMAND

Defendant/Counter-Plaintiff/Third-Party Plaintiff, Automotive Components Holdings, LLC ("ACH"), respectfully brings a third-party Complaint against Solutia, Inc. ("Solutia").

### PARTIES

1.     ACH is a Delaware limited liability company with its corporate headquarters in Dearborn, Michigan.

2.     Solutia is a Delaware corporation with its principal place of business at 575 Merryville Centre Drive, St. Louis, MO 63166.

## JURISDICTION AND VENUE

3.      This is an action for contractual indemnification.  This Court has subject matter jurisdiction over the underlying patent infringement action between Saint-Gobain Glass France ("Saint-Gobain") and ACH; accordingly, it may properly exercise supplemental jurisdiction over this claim pursuant to 28 U.S.C. § 1367(a).

4.      Personal jurisdiction and venue with respect to Solutia are proper in this district because Solutia is qualified to do business in Delaware and has at least one office in this judicial district.

## GENERAL ALLEGATIONS

5.      ACH and Solutia entered into a contractual agreement outlining the "Global Terms for Production Parts and Non-Production Goods and Services" ("the Agreement") (Exhibit 1).

6.      Under the Agreement, Solutia provided ACH with accoustic vinyl to be used in ACH's automotive glazings.

7.      Pursuant to paragraph 15(a) of the Agreement, Solutia has an obligation to indemnify ACH from any claims for infringement brought against ACH based on Solutia's activities under a purchase order.  More specifically, paragraph 15(a) recites:

> **15. INFRINGEMENT AND PROPRIETARY RIGHTS**
> (a)  Seller at its expense will indemnify and hold Buyer harmless with respect to every claim that may be brought against Buyer or others that use the Supplies of a Purchase Order, for any alleged infringement of any present or future patent, copyright, industrial design right or other proprietary right based on Seller's activity under a Purchase Order, or the

-2-

manufacture, sale, or use of the Supplies (i) alone; (ii) in combination by reason of their content, design or structure; or (iii) in combination in accordance with Seller's recommendations. Seller will investigate and defend or otherwise handle every such claim, and at Buyer's request, assist Buyer in Buyer's investigation, defense, or handling of any such claim. Seller will pay all expenses and damages or settlement amounts that Buyer and others selling Buyer's products or using the Supplies of a Purchase Order may sustain by reason of each such indemnified claim. Seller's obligations will apply even though Buyer furnishes all or any portion of the design and specifies all or any portion of the processing used by Seller.

8.    Some of the claims asserted by

Saint-Gobain against ACH are directed to the acoustic

vinyl in its automotive glazings and its general properties.

9.    Solutia provided ACH with the acoustic vinyl used in its

automotive glazings.

## COUNT I
## Contractual Indemnity Against Solutia

10.    ACH incorporates by reference each of the preceding paragraphs

as though fully set forth herein.

11.    To the extent that ACH is adjudicated to be liable to Saint-Gobain

for patent infringement, that liability arose from the products and/or services provide by

Solutia to ACH, causing damage to ACH.

12.    Saint-Gobain's allegations of infringement trigger the

indemnification clause in the Agreement.

13.     Solutia is therefore liable to ACH for indemnification, and for any potential liability ACH has to Saint-Gobain.

## PRAYER FOR RELIEF

**WHEREFORE**, ACH respectfully requests that this Court enter judgment:

A.     Ordering Solutia to pay whatever amount and to whatever extent that ACH is determined to be liable to Saint-Gobain for infringement of Saint-Gobain's alleged intellectual property rights;

B.     Ordering Solutia to pay ACH all amounts expended by ACH in costs, attorneys fees and other fees associated with the defense of this lawsuit; and

C.     Grant all other relief this Court deems fair and equitable.

## DEMAND FOR JURY TRIAL

ACH hereby demands a jury trial for all issues to triable.


**CONNOLLY BOVE LODGE & HUTZ LLP**


Dated: _____          By:_____
                                     Collins J. Seitz, Jr. (#2237)
                                     Kevin F. Brady  (#2248)
                                     1007 N. Orange Street
                                     P.O. Box 2207
                                     Wilmington, DE  19899
                                     Tel: (302) 658-9141

                                     *Attorneys for Defendant/Counter-*
                                     *Plaintiff/Third-Party Plaintiff*


-4-

OF COUNSEL:

Ernie L. Brooks   (P22875)
Frank A. Angileri  (P45611)
Brian S. Tobin  (P67621)
**BROOKS KUSHMAN P.C.**
1000 Town Center
Twenty-Second Floor
Southfield, Michigan 48075-1238
Tel:  (248) 358-4400
Fax:  (248) 358-3351
Email: ebrooks@brookskushman.com
       fangileri@brookskushman.com
       btobin@brookskushman.com

# Exhibit 1

Note: These Automotive Components Holdings, LLC *Global Terms and Conditions for Production Parts and Non-Production Goods and Services* (V11/06) are based on the Visteon Corporation Global Terms for Production Parts and Non-Production Goods and Services (Rev. 4/03), which have been modified to substitute "ACH" where "Visteon" appears and to remove specific Visteon requirements that do not apply to ACH.

## GLOBAL TERMS
## FOR PRODUCTION PARTS AND NON-PRODUCTION GOODS AND SERVICES

### GENERAL

These terms and conditions, together with all documents specifically referenced herein or otherwise issued by Automotive Components Holdings, LLC ("ACH") (whether in writing or electronically), as those documents may be amended from time to time, represent the entire agreement between the parties. These terms and conditions and associated documents are issued on behalf of ACH or the ACH subsidiary identified on the face of a Purchase Order or Release as the "Buyer" and will apply to all orders issued to the Seller for parts and materials for production and non-production goods and services ("Supplies"). The reference to "Purchase Order" herein shall include an individual Purchase Order, a blanket Purchase Order, Release, a Tooling Purchase Order or other similar document or written authorization approved by Buyer and issued to Seller.

### 1.  AGREEMENT AND ACCEPTANCE

(a) These terms and conditions constitute the parties' contractual agreement and supersede any previous oral or written representations, including but not limited to provisions in Seller's quotations, proposals, acknowledgments or other documents. No course of dealing or usage of trade shall be applicable unless expressly incorporated in the Purchase Order or these terms and conditions. These terms and conditions may not be varied or modified in any manner, unless in a subsequent writing signed by an authorized representative of Buyer. Any stenographic or clerical errors in these terms and conditions are subject to correction by Buyer.

(b) Once accepted, such Purchase Order together with these terms and conditions will be the complete and exclusive statement of the purchase agreement.

(c) Seller's written acknowledgment, commencement of work on the Supplies, or shipment of such Supplies, whichever occurs first, shall be deemed an effective mode of acceptance of the Purchase Order and these terms and conditions. Any acceptance by Seller is limited to acceptance of the express terms set forth in the Purchase Order and these terms and conditions. Any proposal for additional or different terms or any attempt by Seller to vary in any degree any of the terms of this offer is hereby objected to and rejected. Any such proposal shall not operate as a rejection of this offer unless the variances are in the terms of the description, quantity, price or delivery schedule of the Supplies, but shall be deemed a material alteration. Accordingly, this offer shall be deemed accepted by Seller without such additional or different terms. If the Purchase Order and these terms and conditions shall be deemed an acceptance of a prior offer by Seller, the acceptance is expressly made conditional

on assent to the additional or different terms and such acceptance is limited to the express terms set forth in the Purchase Order and these terms and conditions. Additional or different terms or any attempt by Seller to vary in any degree any of the terms of the Purchase Order or these terms and conditions shall be deemed material and are objected to and rejected. Documents issued by Buyer through its computer system or other electronic means shall be valid without signature.

2.    MODIFICATIONS

(a)  Buyer, by way of written notice, shall have the right to make or cause Seller to make any changes, additions or alterations in the items, quantities, destination, specifications, drawings, designs or delivery schedules.

(b)  If any such changes affects cost or timing, Buyer may, at its discretion, equitably adjust the price or time for performance where the Seller's direct costs are materially affected by such changes after receipt of documentation in such form and detail as Buyer may direct. Any request by Seller for an adjustment in price or terms must be made within thirty (30) days of any such change. All changes and adjustments, if any, must be in writing and signed by a duly authorized representative of Buyer. If Seller does not provide timely notice to Buyer that a requested change may result in a difference in price or time for performance, the parties agree that the Buyer's requested change did not affect the price or time for performance.

(c)  Seller will not make any change in the design, processing, packing, marking, shipping or date or place of delivery of the Supplies unless done pursuant to Buyer's instructions or with Buyer's written approval.

3.    SUPPLIER    QUALITY    AND    DEVELOPMENT;    SAMPLES;    PPAP;    PARTS IDENTIFICATION

(a)  Seller will conform to the quality control standards and inspection system, as well as related standards and systems (including without limitation, quality control policies, TS 16949, QS 9000 and ISO 9000), that are established by Buyer and Buyer's customers.

(b)  Seller will also participate in supplier quality and development programs of Buyer and Buyer's customers that apply to the Supplies described in a Purchase Order, including meeting specified quality and delivery rating criteria.

(c)  Seller agrees to meet the full requirements of industry Production Part Approval Processes (PPAP) as specified by Buyer and Buyer's customers and agrees to present this information to Buyer upon request, at the level requested, unless otherwise specifically agreed by Buyer in writing.

(d)  All Supplies that are a completed part shall permanently bear Buyer's part number and name or code name, Seller's part number, and Seller's date of manufacture, unless otherwise agreed by Buyer in writing.

(e) Seller will supply samples in accordance with the applicable quality standards as set forth above if samples are specified as required by a Purchase Order.

(f) Seller's providing production and/or service parts or materials under a Purchase Order shall be required to successfully enter all required Bill of Material and material composition data into the IMDS (International Material Data System) or into a Buyer approved alternate system prior to prototype submission, initial PPAP and PPAPs for subsequent design changes. Failure to successfully complete the required IMDS information will prevent the Seller from receiving PPAP approval.

(g) Seller agrees to meet the full requirements of directive 2000/53/EC of the European Parliament and of the Council (End-of-live-vehicle-directive) and of the International Material Data System (IMDS) as specified by Buyer and Buyer's customers and agrees to present complete information to Buyer upon request, at the level requested, unless otherwise specifically agreed by Buyer in writing.

(h) Seller agrees to meet the full requirements of the Buyer's AIAG EDI (Electronic Data Interchange) standards and Buyer's Proprietary DDL (Direct Data Link) Requirements.

4.   BAILED PROPERTY

The right, title and interest to all supplies, materials, tools, jigs, dies, gauges, fixtures, molds, patterns, equipment, designs, drawings, specifications, spare parts, trial parts, ancillary products, items owned by Buyer and other items furnished by Buyer ("Tools") to Seller for use in manufacturing the Supplies, or for which Seller is reimbursed by Buyer, shall be and remain the property of Buyer.  Seller shall bear the risk of loss of and damage to Buyer's property.  Seller will (i) properly house and maintain the Tools on Seller's premises; (ii) not use the Tools for any purpose other than for performance under the Purchase Order; (iii) prominently mark the Tools as property of Buyer; (iv) refrain from commingling the Tools with the property of Seller or with that of a third party; (v) adequately insure the Tools against loss or damage, including but not limited to maintaining full fire and extended coverage insurance for replacement value and naming Buyer as an additional insured; (vi) take reasonable steps to ensure that the Tools do not become subject to any liens or other claims; and (vii) not move the Tools to another location whether owned by Seller or a third party, without the prior written consent of Buyer, except in the case of an emergency, Seller may move the Tools provided that it gives Buyer notice that the Tools have been moved and the location of the Tools as soon as practicable.  Buyer will have the right to enter Seller's premises at reasonable times to inspect the Tools and Seller's records pertaining thereto. Seller expressly waives and releases any and all statutory, equitable or other liens, including but not limited to any molder liens, special tool liens, builder liens and the like, that Seller has or might have on or in connection with the Tools for any and all work, including but not limited to, designing, manufacturing, improving, maintaining, servicing, using, assembling, fabricating or developing the Tools.  Seller hereby agrees to indemnify, defend and hold Buyer harmless from and against any loss, liabilities, costs, expenses, suits, actions, claims and all other obligations and proceedings, including without limitation all attorney's fees and any other cost of litigation that are in any way related to releasing, terminating or otherwise removing any such liens placed on the Tools. Seller will assign to Buyer any claims Seller has against third parties with respect to Buyer's property.  Upon written request, Seller, at its

expense, shall immediately deliver the Tools at Buyer's option F.O.B. Carrier Seller's facility (Ex Works Loaded) or F.O.B. Buyer's premises (CIF Buyer Plant/Delivered Buyer Plant), properly packed and marked in accordance with the requirements of the carrier and Buyer. Seller will cooperate with Buyer's removal of the Tools from Seller's premises. Seller shall assume all risk of death or injury to persons or damage to property arising from use of the Tools. Unless otherwise agreed to in writing by Buyer, Seller at its own expense shall keep the Tools in good condition and repair, including repair necessitated by wear and tear and other usage by Seller. In the event that it becomes necessary, as determined by either Buyer or Seller, to replace the Tools due to normal use by the Seller, or otherwise, said replacement tools shall be at the sole expense of the Seller and said replacement tools shall remain the property of the Buyer. Buyer does not guarantee the accuracy of any Tools or the availability or suitability of any supplies or material furnished by it. Seller assumes sole responsibility for inspecting, testing and approving all Tools or other materials supplied by Buyer prior to any use by Seller. Seller shall assume all risk of death or injury to persons or damage to property arising from use of the Tools or other materials supplied by Buyer and hereby agrees to indemnify Buyer against the same.

5.    DELIVERY DATES, TITLE TRANSFER, RELEASES

(a) If delivery dates are not specified in a Purchase Order, Seller will procure materials and fabricate, assemble, and ship Supplies or provide services only as authorized in shipment releases issued to Seller by Buyer. The quantities indicated shall be shipped on the day(s) and time(s) specified by the Buyer. Schedule requirements may include shipping on any Saturday, Sunday, local/international holiday and/or other Seller downtime. Raw material purchase authorization and fabrication authorization are included in Buyer's planning (830) releases.

(b) Buyer is not obligated to accept and may return overshipments, early deliveries, late deliveries, and partial deliveries to Seller at Seller's risk and expense for all packing, handling, sorting, and transportation. Buyer, at any time may change or temporarily suspend shipping schedules specified in a Purchase Order or shipment release or other written instructions issued by Buyer pursuant to this Section, neither of which entitles Seller to modify the price for Supplies covered by a Purchase Order.

(c) Time and quantity are of the essence in any Purchase Order.

(d) Unless otherwise agreed, delivery times specified are the times of delivery of the Supplies at Buyer's designated place of delivery or destination. If delivery is not timely made, Buyer may, in addition to its other rights and remedies, direct Seller to make expedited routing at Seller's expense.

(e) Title to the inventory will remain with the Supplier until the earlier of when such inventory is consumed in the process of producing products at the Buyer plant or upon expiration of five (5) Buyer Plant working days after such inventory is received at the Buyer Plant. The risk of loss or damage to this inventory shall be the responsibility of Buyer (or its specified third party carrier) both while in transit to and after receipt at the Buyer facility.

6.    PACKING, MARKING, AND SHIPPING

(a)  Seller will pack, mark and ship Supplies in accordance with all applicable packaging standards of Buyer and, as appropriate, the carrier transporting such Supplies.  Buyer's standards for Supplies shipped to all other destinations are available upon request.  Seller will ensure that any third parties who supply packaging for Buyer's Supplies agree to comply with such standards.  Seller will reimburse Buyer for all expenses incurred by Buyer as a result of improper packing, marking, routing, or shipping.

(b)  Upon request, Seller will assist Buyer with regard to packing, marking, routing, and shipping that will enable Buyer to secure the most economical transportation rates.

(c)  Seller will not charge separately for packing, marking, or shipping, or for materials used therein unless Buyer specifies in writing that it will reimburse Seller for such charges.

(d)  Buyer may require shipment of any of the Supplies by a more expeditious method of transportation if Seller fails to meet the shipping requirements of a Purchase Order and Seller will bear the cost difference of such transportation unless such failure is due to an excusable delay as specified in Paragraph 22.  Seller shall pay any costs incurred by Buyer, including costs charged by Buyer's customers to Buyer as a result of Seller's failure to comply with shipping or delivery requirements.

(e)  For Supplies that may contain potentially hazardous materials, Seller shall promptly furnish to Buyer in whatever form and detail Buyer requests (i) a list of all potentially hazardous ingredients in the Supplies; (ii) the quantity of one or more such ingredients; and (iii) information concerning any changes in or additions to such ingredients.  Before shipping the Supplies, Seller agrees to furnish to Buyer sufficient warning and notice in writing (including appropriate labels on the Supplies, containers and packing) of any hazardous material that is an ingredient or a part of any of the Supplies, together with such special handling instructions necessary to advise carriers, Buyer, and their respective employees how to exercise that measure of care and precaution that will best prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the Supplies, containers and packing shipped to Buyer.  Seller shall comply with all applicable federal, state, provincial and local laws and regulations pertaining to product and warning labels.

7.   SHIPPING DOCUMENTS

(a)  For Supplies shipped to European destinations bills of lading and advice notes must accompany each material shipment.  In all other respects, Seller shall conform to Buyer's applicable Materials Shipping Guide.  The delivery term applying to each Purchase Order will be stated thereon and on any other such documents as are referenced on the relevant order.

(b)  For Supplies shipped to North American destinations (i) Seller will obtain a straight bill of lading from the carrier of the Supplies and will include on each packing slip and bill of lading the number of the relevant Purchase Order and the destination address; and (ii) Seller will include a numbered master packing slip with each shipment.

(c)  For shipments of less than a full carload or truckload, the slip will be included in one of the packages which will be marked "Packing Slip Inside."  In full carload and truckload

shipments, the master packing slip will be enclosed in an unsealed envelope that is affixed near the door on the inside of the freight vehicles.

(d)  Seller will retain the original bill of lading for the calendar year plus 5 addition years from the date of shipment unless otherwise directed by the Buyer's Agent at the destination facility

(e)  For each shipment, Seller will comply with the customs or NAFTA related obligations, origin marking or labeling requirements, invoicing and documentation requirements of the destination country, and local content origin requirements.  Export licenses or authorizations necessary for the export of Supplies are Seller's responsibility unless otherwise indicated in a Purchase Order, in which case Seller will provide the information necessary to enable Buyer to obtain the licenses or authorizations.  Seller will promptly notify Buyer in writing of any material or components used by Seller in filling a Purchase Order that Seller purchases in a country other than the country in which the Supplies are delivered.  If Supplies are manufactured in a country other than the country in which Supplies are delivered, Seller will mark Supplies "Made in (country of origin)."  Seller will provide to Buyer and the appropriate governmental agency the documentation necessary to determine the admissibility and the effect of entry of Supplies into the country in which Supplies are delivered.  Seller warrants that any information that is supplied to Buyer about the import or export of Supplies is true and that all sales covered by a Purchase Order will be made at not less than fair value under the anti-dumping laws of the countries to which the supplies are exported.  Seller will include a priced invoice (if required) with the master packing slip and upon request will furnish all other documentation required for export from Seller's country or import into Buyer's country.  Any and all benefits or credits resulting from a Purchase Order with Buyer, including but not limited to trade credits, export credits, customs drawbacks, rebate of taxes, fees, etc. will belong to Buyer (unless otherwise stated on a Purchase Order or a country's practice is to let credits remain with Seller).  Seller upon request will furnish all documents required to obtain the foregoing benefits and credits and will identify the country of origin of the materials used in the Supplies and the value added thereto in each country.  Additional customs information is available upon request from Buyer's customs department in the destination country.

8.    INSPECTION

Buyer may inspect the Supplies during any stage of their manufacture, construction, preparation, delivery or completion.  Buyer and Buyer's customers shall have the right to enter onto Seller's premises at reasonable times to inspect the facility, supplies, materials and any of the Buyer's property covered by a Purchase Order.  Seller agrees to provide any and all supporting documentation required by Buyer or Buyer's customers in the course of such investigation. At Buyer's request, Seller shall submit production and quality test reports and related data.  Notwithstanding payment or prior inspection, Buyer, in addition to any other remedies that it may have, at its option may reject and return at Seller's risk and expense, or retain and correct, Supplies that fail to conform to the requirements of a Purchase Order even if the nonconformity does not become apparent until the manufacturing or processing stage.  If Buyer elects to correct the Supplies, it will consult with Seller on the method of correction. Seller will reimburse Buyer for all reasonable expenses resulting from rejection or correction. Supplies rejected shall be removed by the Seller at its expense and at its risk.   Final acceptance shall not be conclusive with respect to latent defects or misrepresentations.

Nothing in this agreement shall relieve Seller from the obligation of testing, inspection and quality control.

9.   INVOICES, PAYMENT

(a)   Seller will operate in accordance with all applicable payment guidelines provided by Buyer which cover both invoiced items and those handled by Buyer's Evaluated Receipt System (ERS).

(b)  Unless otherwise agreed, Buyer's standard payment terms will apply to all payments due for Supplies pursuant to a Purchase Order.  Such standard payment terms are available by reference to Buyer's website: https://portal.covisint.com/portal/

(c)  Seller agrees that all its accounts with Buyer will be administered on a net settlement basis and that Buyer may set off debits and credits, including Buyer's attorney fees and costs of enforcement, against any of Seller's accounts regardless of basis for such debits and credits and without advance notice.  In this Section 9(c) "Buyer" includes Buyer's parent, subsidiaries and affiliates, and "Seller" includes Seller's parent, subsidiaries and affiliates.

(d)  Unless a Purchase Order specifically states otherwise, all payments for Supplies shall be made in the local currency of the Seller's manufacturing location for the Supplies or in the case of services, in the local currency of Buyer's location that receives the services.

10.  SERVICE AND REPLACEMENT PARTS

(a)  At Buyer's request, Seller will sell to Buyer or Buyer's agent (i) the Supplies of a Purchase Order for production parts or components necessary to fulfill Buyer's current model service and replacement requirements for such Supplies at the prices specified in the Purchase Order plus any actual cost differential for packaging; and (ii) if such Supplies are assemblies, service and replacement parts of the assemblies at prices such that the total price of all parts of the assembly does not exceed the price of the assembly specified in the Purchase Order less assembly costs plus any actual cost differential for packaging.

(b)  At Buyer's request during the longer of (i) the ten-year period after Buyer completes current model purchases; or (ii) such time period granted to Buyer's customers for service and replacement parts, Seller will sell to Buyer Supplies to fulfill Buyer's past model service and replacement requirements at the prices specified in a Purchase Order plus any actual cost differential for packaging.  During the tenth year of such period, Buyer and Seller will negotiate in good faith with regard to Seller's continued manufacture of service and replacement Supplies.

11.  APPLICABLE TAXES

(a)  The total price specified for Supplies on a Purchase Order will include any and all freight, duty and taxes, as specified in the relevant delivery term, with the exception of the following items, which, if applicable, must be identified and listed separately on Seller's quote and invoice (i) any U.S. state or local sales or use tax imposed on the transaction, as covered by

clause 11(b) below; and (ii) any value-added tax ("VAT") imposed on the transaction by countries or tax authorities outside of the U.S.

(b) For Supplies to be provided to U.S. destinations by U.S. suppliers, most purchases will be covered by clauses 11(c) and (d) below. If not covered by such provisions, Seller must include state or local sales or use tax if Seller is licensed to do so by the tax authorities of the destination state. Seller must identify the sales or use tax on Seller's quote and invoice as a separate item.

(c) For production Supplies shipped to U.S. destinations or services to be provided in the U.S., Seller will not charge to Buyer state or local sales or use taxes on such production Supplies and services. Buyer will use or consume such Supplies and services for resale or in industrial processing or manufacturing or will attach them to taxable goods for sale. Buyer shall furnish to Seller the applicable sales or use tax exemption certificate(s) upon request.

(d) Seller will not charge to Buyer sales or use taxes on purchases of prototype, experimental or non-production Supplies or services that are delivered to Buyer in states in which Buyer has a direct pay permit. Those destinations are listed below and Buyer's representative will supply the applicable permit number upon request:

> **State of Destination**
> Indiana
> Michigan
> Ohio
> Oklahoma
> Tennessee

Notwithstanding the foregoing, in order to be reimbursed for any sales or use taxes, Seller must specifically identify such taxes on Seller's quote and invoice as a separate line item.

12.    WARRANTY

(a)   Seller expressly warrants and guarantees to Buyer, Buyer's successors, assigns and customers, and the users of Buyer's products, that all Supplies delivered to Buyer will, during the Warranty Period set forth below (i) conform to the specifications, standards, drawings, instructions, advertisements, statements on containers or labels, descriptions and samples; (ii) be free from defects in workmanship and material and shall be new and of the highest quality; (iii) Buyer shall receive title to the Supplies that is free and clear of any liens, encumbrances and any actual or claimed patent, copyright or trademark infringement; (iv) be merchantable, safe and fit for the Buyer's intended purposes, which purposes have been communicated to Seller; (v) be adequately contained, packaged, marked and labeled; and (vi) be manufactured in compliance with all applicable federal, state and local laws, regulations or orders, and agency or association standards or other standards applicable to the manufacture, labeling, transporting, licensing, approval or certification, including by way of illustration and not by way of limitation, the Occupational Health and Safety Act, the Fair Labor Standards Act, and any law or order pertaining to discrimination including any regulations in force in countries where the Supplies or Buyer's customer's vehicles equipped with the Supplies are to be sold. All services performed by Seller shall be performed in a competent, workmanlike

manner and in accordance with industry standards. These warranties shall be in addition to all other warranties, express, implied or statutory. These warranties shall survive inspection, test, delivery, acceptance, use and payment by Buyer and shall inure to the benefit of Buyer, its successors, assigns, customers and the users of Buyer's products. These warranties may not be limited or disclaimed by Seller. Buyer's approval of Seller's design, material, process, drawing, specifications or the like shall not be construed to relieve Seller of the warranties set forth herein, nor shall a waiver by Buyer of any drawing or specification request for one or more articles constitute a waiver of any such requirements for the remaining articles to be delivered hereunder unless so stated by Buyer in writing.

(b)  Seller will indemnify and hold Buyer harmless in respect of the cost of recall campaigns and other corrective service actions that, in Buyer's reasonable judgment, are required to rectify non-conformities in the Supplies that are the result of a breach of the foregoing warranty, whether such recall campaigns are mandated by any governmental entity or by the Buyer.

(c)  "Warranty Period" shall mean the longer of the following time periods (i) 18 months from the day of first use of the Supplies by Buyer or acceptance by Buyer, whichever occurs later; or (ii) if the Supplies are utilized in new vehicles, the Warranty Period will continue for the same period as the new vehicle warranty period offered to retail purchasers in the country in which the vehicle is sold. For Supplies purchased by Buyer as service and replacement parts, the Warranty Period will be the greater of twelve months from delivery to Buyer's customer or the remainder of the warranty period on the vehicle on which the part is installed as a service or replacement part. Seller may contact Buyer's representative for information regarding those countries in which vehicles incorporating Supplies purchased from Seller will be sold. Notwithstanding the foregoing, Seller agrees to waive the expiration of the Warranty Period in the event there are failures or defects discovered after the Warranty Period of a significant nature or in a significant portion of the goods, or a defect is discovered which, in Buyer's opinion, constitutes a threat of damage to property or to the health and safety of any person.

(d)  Seller represents and warrants that the prices for the Supplies will be no less favorable than those which Seller presently, or in the future, offers to any other customer for the same or similar goods or services for similar quantities. If Seller offers a lower price for the same or similar goods or services to any other customer during the term of a Purchase Order, then to the extent permitted by law, Seller will immediately offer Buyer the same price for the Supplies on the same terms and conditions as was offered to the other customer.

13.  DEFENSE, INDEMNITY AND INSURANCE

(a)  To the fullest extent permitted by law, Seller agrees to indemnify, hold harmless and defend Buyer and its affiliated companies, their directors, officers, employees, agents and customers ("Indemnitees") from and against any loss, liabilities, costs, expenses, suits, actions, claims and all other obligations and proceedings, including without limitation all judgments rendered against, and all fines and penalties imposed upon, Indemnitees and all attorney's fees and any other cost of litigation ("Liabilities") that are in any way related to Seller's performance or obligations under a Purchase Order, including claims arising out of a breach hereof, warranty claims, product recall claims, product liability claims, injuries to persons, including death, or damage to property caused by Seller, its employees, agents,

subcontractors, or in any way attributable to the performance of Seller, including without limitation, breach of contract, breach of warranty or product liability. Seller's obligation to defend and indemnify under this Section will apply regardless of whether the claim arises in tort, negligence, contract, warranty, strict liability or otherwise except for claims that arise as a result of the sole negligence of Buyer. Seller agrees to indemnify, save harmless and defend Indemnitees from and against all Liabilities arising out of actual or alleged infringement, including infringement of any patent, trademark or copyright relative to the goods.

(b) If Seller provides services to Buyer on Buyer's premises, Seller will examine the premises to determine whether they are safe for such services and will advise Buyer promptly of any situation it deems to be unsafe. Seller's employees, contractors and agents will not possess, use, sell or transfer illegal drugs, medically unauthorized drugs or controlled substances, or unauthorized alcohol, and will not be under the influence of alcohol or drugs on Buyer's premises. Seller shall be exclusively responsible for, shall bear, and shall relieve Buyer from liability for all loss, expense, damage or claims resulting from bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person or persons, or on account of damage to or destruction of property, including that of Buyer, arising out of, or in connection with the performance of work on Buyer's premises except that Seller shall not be responsible for or relieve Buyer from liability for claims arising from the willful misconduct or the sole negligence of Buyer. For services performed on Buyer's premises in Canada, Seller must furnish, prior to payment, evidence of compliance with the Workplace Safety and Insurance Act, 1997 or other applicable workers' compensation legislation and compliance with all other applicable laws and regulations.

(c) Seller shall maintain insurance coverage in amounts not less than the following (i) Workers' Compensation Statutory Limits for the state or states in which this agreement is to be performed (or evidence of authority to self-insure) and Employers Liability insurance for not less than $1 million; (ii)   Comprehensive General Liability (including Products / Completed Operations and Blanket Contractual Liability for not less than $3 million combined single limit per occurrence; (iii) Automobile Liability insurance covering all owned, non-owned and hired vehicles with limits for not less than $3 million combined single limit per occurrence; (iv) Such other Liability insurance as may be required by the specific nature of this agreement.  At Buyer's request, Seller shall furnish certificates of insurance setting forth the amounts of coverage, policy numbers and dates of expiration for insurance maintained by Seller within ten (10) days of Buyer's written request. The above insurance policies of the Sellers shall be primary to any self-insurance or insurance policies carried by the Buyer.  In addition, the Seller shall name the Buyer as additional insured on the Comprehensive General Liability, Automobile and Umbrella policy(ies).  Such certificates shall provide that Buyer will receive 30 days prior written notification from the insurer of any termination or reduction in the amount or scope of coverages.  Seller's purchase of insurance coverage and the furnishing of certificates of insurance shall not release Seller of its obligations or liability under this agreement.  In the event of Seller's breach of this provision, Buyer shall have the right to cancel the undelivered portion of any Supplies and shall  not be required to make further payments except for conforming Supplies delivered prior to cancellation.

14.  TITLE AND ENGINEERING DRAWINGS, SPECIFICATIONS

(a) Any documents produced or acquired by Seller under a Purchase Order will belong to Buyer. Any engineering drawing that Seller is required to prepare and furnish to Buyer will conform to the requirements of the local Computer Aided Design standards of the Buyer.

(b) All drawings, know-how, and confidential information supplied to Seller by Buyer and all rights therein will remain the property of Buyer and will be kept confidential by Seller in accordance with Section 16(f). Seller is licensed to use Buyer's drawings, know-how and confidential information only for the purpose of fulfilling its obligations under a Purchase Order. In addition to the obligations of Section 16(f), Seller will not disclose such drawings to third parties unless this is required for Seller to fulfill its duties under a Purchase Order. Seller will inform Buyer in writing of any third parties to whom Seller subcontracts any of the work required under a Purchase Order specifying in detail the work which has been subcontracted to such third party. Seller will ensure that any third party to whom Seller subcontracts any of the work hereunder is bound by all the terms and conditions relating to such work to which Seller is bound under a Purchase Order.

15. INFRINGEMENT AND PROPRIETARY RIGHTS

(a) Seller at its expense will indemnify and hold Buyer harmless with respect to every claim that may be brought against Buyer or others that use the Supplies of a Purchase Order, for any alleged infringement of any present or future patent, copyright, industrial design right or other proprietary right based on Seller's activity under a Purchase Order, or the manufacture, sale, or use of the Supplies (i) alone; (ii) in combination by reason of their content, design or structure; or (iii) in combination in accordance with Seller's recommendations. Seller will investigate and defend or otherwise handle every such claim, and at Buyer's request, assist Buyer in Buyer's investigation, defense, or handling of any such claim. Seller will pay all expenses and damages or settlement amounts that Buyer and others selling Buyer's products or using the Supplies of a Purchase Order may sustain by reason of each such indemnified claim. Seller's obligations will apply even though Buyer furnishes all or any portion of the design and specifies all or any portion of the processing used by Seller.

(b) Seller grants to Buyer a nonexclusive, royalty free, permanent, paid-up, irrevocable license with a right to grant a sublicense to any of its Associated Companies to rebuild and have rebuilt the Supplies of a Purchase Order. Associated Company means ACH (if it is not the Buyer under a Purchase Order) and any company in which ACH owns, directly or indirectly, twenty-five percent or more of the capital or voting stock.

(c) Seller will neither assert nor transfer to another a right to assert against Buyer and/or any of its Associated Companies, or dealers or customers or suppliers thereof, any intellectual property right of Seller that is applicable to any works of authorship furnished to Buyer or any of Buyer's Associated Companies in the course of Seller's activity hereunder.

(d) Seller will not sell, transfer or otherwise dispose of any product that incorporates any trademark, patentable invention, copyright work, industrial design or other matter that is the subject of any intellectual property right of Buyer or any of its Associated Companies to any party other than Buyer except where specifically authorized by Buyer in writing.

16. INFORMATION AND DATA

(a)  Seller will furnish to Buyer, or another party designated by Buyer, without restrictions on use or disclosure, all information and data Seller acquires or develops in the course of Seller's activities under a Purchase Order.  At Buyer's request, Seller also will discuss with Buyer or another party designated by Buyer, without restrictions on use or disclosure, any potential design, quality or manufacturing problems with Supplies Seller worked on or produced pursuant to a Purchase Order.

(b)  At Buyer's request, Seller will furnish to Buyer all other information and data of Seller which Buyer deems necessary to understand the operation and to maintain the goods delivered under a Purchase Order, and to understand and apply the information and data of Section 16(a) hereof, with no restrictions on use other than Seller's patent rights.

(c)  With respect to inventions which Seller conceives or first reduces to practice in the course of Seller's activities under a Purchase Order, Seller grants to Buyer a permanent, paid-up, nonexclusive, worldwide license, with a right to sublicense others, to make, have made, use, have used and sell manufactures, compositions, processes, and machines covered by patents on such inventions.

(d)  Seller grants to Buyer a permanent, paid-up, nonexclusive, worldwide license, including a license to any operating software incorporated into the Supplies with a right to grant a sublicense to any of its Associated Companies, to (i) make, have made, use, have used and sell the Supplies of a Purchase Order or derivatives thereof under any other patents now or hereafter owned or controlled by Seller which are deemed necessary by Buyer to exercise the license of Section 16(c) in the manufacture, use or sale of products or services manufactured or made by or for Buyer or any of its Associated Companies; and (ii) use, repair, modify and sell any operating software incorporated in the Supplies in conjunction with the use or sale of the Supplies.

(e)  To the extent Buyer requires a license that is not provided in Sections 16(c) and 16(d), Seller grants to Buyer and agrees to grant to any Associated Company designated by Buyer a nonexclusive license, on reasonable terms and conditions, to make, have made, use, have used and sell under any other patents now or hereafter owned or controlled by Seller which cover any application of the technology embodied in the information or data Seller acquires or develops in the course of Seller's activities under a Purchase Order.

(f)  Unless otherwise indicated in writing by Buyer, Seller will use reasonable care to prevent disclosing to others and will use only for the benefit of Buyer (i) the technical information and data furnished by Buyer or developed or acquired by Seller in its work under a Purchase Order, prior development agreement or early sourcing agreement for Supplies related to or using such technical information or data, and (ii) information relating to any portion of Buyer's business that Seller may acquire in the course of Seller's activities under a Purchase Order, prior development agreement or early sourcing agreement.  This obligation shall continue so long as any Purchase Order for Supplies related to or using such technical information or data is in effect and for a period of two years thereafter.  This obligation will not apply to information that is or becomes publicly known through no fault of Seller.  Nevertheless, Seller may disclose the information and data of subsections (f)(i) and (f)(ii) hereof to third parties if this is required for Seller to fulfill its duties under a Purchase Order

and such third parties have agreed to conditions at least as stringent as those contained herein.

(g)  All technical information and data disclosed heretofore and hereafter by Seller to Buyer in connection with Supplies of a Purchase Order are disclosed on a non-confidential basis.

(h)  In the event that Seller, either now or in the future, sells to Buyer or any of its Associated Companies directly or through another party Supplies which are related to Seller's experimental or development work under a Purchase Order in production quantities for at least two of Buyer's or the Associated Company's model years, the rights and licenses of Section 16(e) will become paid up and irrevocable. The licenses granted under Section 16(c) and 16(d) will survive completion or termination of a Purchase Order under which they are granted.

(i)  In the event Seller provides Supplies under a Purchase Order in production quantities for use on Buyer's products, and Seller refuses or is unable to provide, under commercially reasonable terms, such Supplies to Buyer in additional markets after receiving written request from Buyer, then effective sixty (60) days after receiving such written request, Seller grants Buyer a permanent, paid-up, nonexclusive, worldwide license, with a right to grant sublicenses to any of its Associated Companies, in such additional markets under all intellectual property rights under which Seller has a right to grant licenses, to make, have made, use, have used and sell the Supplies and derivatives thereof in the manufacture of products manufactured by or for the Buyer or any of its Associated Companies and the worldwide sale of such products. Seller shall also cooperate with Buyer in the exercise of such license including providing, without restriction on use, reproduction or disclosure, all information and data deemed necessary by Buyer.

## 17.  COPYRIGHTS

(a)  Any work of authorship created by Seller or Seller's employees under a Purchase Order which is specially ordered or commissioned by Buyer will be considered as a "work made for hire" and all copyrights for such works of authorship will belong to Buyer.

(b)  In the event any portion of any work of authorship created by the Seller in performing the services under a Purchase Order does not qualify as "work made for hire", Seller hereby assigns or, if Seller has failed to previously secure ownership of all copyrights in such portion, will obtain title and assign all copyrights to such work to Buyer.

(c)  All such works of authorship subject to Sections 17(a) or 17(b) will bear a valid copyright notice designating Buyer as the copyright owner, for example, "Copyright © 200X, Automotive Components Holdings, LLC."

(d)  Seller hereby grants to Buyer a permanent, nonexclusive, paid-up, worldwide license, with a right to grant a sublicense to any of its Associated Companies, under each copyright it owns and controls or has the right to license, in each work of authorship fixed in any tangible medium of expression furnished by Seller to Buyer or its designee pursuant to a Purchase Order, to use such work, to reproduce such work, to prepare derivative works, to distribute copies of such work to the public, and to perform and display such work publicly.

ACH V11/06                                    13

18. SUBCONTRACTS

In each subcontract of Seller's work performed pursuant to a Purchase Order, Seller will obtain for Buyer the rights and licenses granted in Sections 14, 16, and 17, and, if applicable, Sections 29 and 31.

19. ADVERTISING

Any reference to Buyer or any of its Associated Companies or use of Buyer's trade marks or logos by Seller in Seller's advertising or publicity materials will comply with Buyer's advertising guidelines.

20. AUDIT RIGHTS

Seller grants to Buyer access to all pertinent information, including but not limited to, books, records, payroll data, receipts, correspondence and other documents and materials in the possession or under the control of Seller, or otherwise relating to any of Seller's obligations under a Purchase Order or any payments requested by Seller pursuant to a Purchase Order. Buyer will have the right at any reasonable time to send its authorized representatives to examine all such information. Seller shall maintain all pertinent information relating to a Purchase Order for a period of four years after completion of services or delivery of Supplies pursuant to that Purchase Order. In the event that any such audit discloses any inaccurate information, the Seller shall indemnify, defend and hold harmless Buyer from and against any loss, liabilities, costs, expenses, suits, actions, claims and all other obligations and proceedings, including but not limited to all attorney's fees and any other cost related thereto.

21. ASSIGNMENT

This agreement is entered into in reliance upon the Seller's personal performance of the duties imposed. Seller will not assign or delegate all or substantially all of its substantive duties under a Purchase Order, nor transfer to another any intellectual property right that is licensed to Buyer hereunder, without Buyer's prior and express written approval. Any such assignment or delegation without the previous written consent of Buyer, at the option of Buyer, shall effect a cancellation of this agreement. Any consent by Buyer to an assignment shall not be deemed to waive Buyer's right to recoupment from Seller and/or its assigns for any claim arising out of this transaction, and shall not prohibit Buyer from enforcing any of its rights against the assignee. Buyer will have the right to assign any benefit or duty under a Purchase Order to any third party upon notice to Seller with or without consent.

22. EXCUSABLE DELAYS

Any delay or failure of either party to perform its obligations shall be excused if it is caused by an extraordinary event or occurrence beyond the control of the non-performing party and without the non-performing party's fault or negligence, such as acts of God, fires, floods, windstorms, explosions, riots, natural disasters and wars. Written notice of such delay, including the anticipated duration of the delay, must be given by the non-performing party within ten (10) days of the event. During the period of any delay or failure to perform by

Seller, Buyer, at its option (i) may purchase goods from other sources and reduce its schedules to Seller by such quantities, without liability to Seller; (ii) cause Seller to provide the goods from other sources in quantities and at times requested by Buyer at the price set forth in this agreement; or (iii) may request Seller to deliver to Buyer at Buyer's expense all finished goods, work in process and parts and materials produced or acquired for work under a Purchase Order. If requested by Buyer, Seller shall, within five (5) days of such request, provide adequate assurance that the delay will not exceed such period of time as Buyer deems appropriate. If the delay lasts more than the time period specified by Buyer, or Seller does not provide adequate assurance that the delay will cease within such time period, Buyer may, among its other remedies, immediately cancel this agreement without liability. Prior to the expiration of any directly related labor contract of Seller, Seller at its expense will take such actions as Seller may reasonably determine to ensure the uninterrupted production of supplies for a period of thirty (30) days for Buyer during any anticipated labor disruption or slowdown resulting from the expiration of the labor contract.

## 23. REMEDIES, WAIVER

Buyer's rights and remedies shall be cumulative and in addition to any other rights or remedies provided by law or equity. A waiver by Buyer of any right or remedy shall not affect any rights or remedies subsequently arising under the same or similar clause. Any attempt by Seller to limit Buyer's warranties, remedies or the amount and types of damages that Buyer may seek shall be null and void. At Buyer's request, Seller will reimburse Buyer for all incidental, consequential and special damages caused by nonconforming Supplies, including but not limited to, costs, expenses, and losses incurred directly or indirectly by Buyer or its customers (i) in inspecting, sorting, repairing or replacing the nonconforming Supplies; (ii) resulting from production interruptions; (iii) conducting recall campaigns or other corrective service actions; or (iv) resulting from personal injury (including death) or property damage caused by the nonconforming Supplies. Consequential damages include professional fees incurred by Buyer. In any action brought by Buyer to enforce Seller's obligation to produce and deliver Supplies under a Purchase Order, the parties agree that the Buyer, at its option and in addition to any other remedies available, is entitled to specific performance of Seller's obligations under a Purchase Order. Buyer shall not, under any circumstances, be liable to Seller for incidental, consequential, or special damages.

## 24. TERMINATION

(a) Unless a Purchase Order specifically states otherwise, Buyer may terminate its purchase obligations under a Purchase Order, in whole or in part, at any time by a written notice of termination to Seller. Buyer will have such right of termination notwithstanding the existence of an Excusable Delay of Section 22.

(b) Upon termination by Buyer pursuant to Section 24(a), Buyer's obligation to Seller will be (i) the Purchase Order price for all finished work and completed services which conform to the requirements of a Purchase Order; (ii) Seller's reasonable costs of the work in process and parts and materials transferred to Buyer in accordance with subsection (g)(ii) hereof; (iii) Seller's reasonable costs of settling the claims by subcontractors of subsection (g)(iii) hereof; and (iv) Seller's actual cost of carrying out its obligations of subsection (g)(iv) hereof, but Buyer's obligations will not exceed those Buyer would have had to Seller in the absence of

termination. Unless otherwise agreed in writing, Buyer shall have no obligation for and shall not be required to make payments to Seller, directly or on account of claims for Seller's suppliers and subcontractors, for loss of anticipated profit, overhead, product development and engineering costs, tooling, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, and general and administrative burden charges resulting from the termination of a Purchase Order.

(c)  Seller will furnish to Buyer, within one month after the effective date of termination, Seller's proposed termination claim, which will consist exclusively of the items of Buyer's obligation to Seller that are listed in subsection (b) hereof.  Buyer may audit Seller's records, before or subsequent to payment, to verify amounts requested in Seller's termination claim. Buyer shall evaluate and make a final binding decision with respect to such termination claim.

(d)  In addition to its other remedies, Buyer may, at its option, terminate a Purchase Order without liability to Seller if (i) Seller sells, or offers to sell, a substantial portion of its assets used for the production of Supplies for Buyer; (ii) Seller sells or exchanges, or offers to sell or exchange an amount of its stock that would result in a change in the control of Seller; or (iii) the Seller fails to remain competitive with respect to quality, technology, delivery and pricing of the Supplies.  In the event of a termination pursuant to this Section 24(d), Buyer shall give Seller written notice of the termination at least thirty (30) days prior to the effective termination date.  Seller shall notify Buyer no more than ten (10) days after entering into any negotiations for the sale or exchange of its stock or assets that could result in a change of control of Seller.  Upon Seller's request, Buyer will execute an appropriate non-disclosure agreement relating to information disclosed by Seller regarding the potential transaction. Buyer will have no obligation to Seller under subsection (b) or (c) above if Buyer terminates its purchase obligations of a Purchase Order pursuant to this subsection (d).

(e)  A Purchase Order may be terminated immediately by Buyer without liability to Seller if any of the following events, or any other comparable events, and Seller shall reimburse Buyer for all costs incurred by Buyer in connection with any of the following, including but not limited to all attorney's and other professional fees (i) Seller becomes insolvent; (ii) Seller files a voluntary petition in bankruptcy; (iii) an involuntary petition in bankruptcy is filed against Seller; (iv) a receiver or trustee is appointed for Seller; (v) Seller needs accommodations from Buyer, financial or otherwise, in order to meet its obligations under a Purchase Order; or (vi) Seller executes an assignment for the benefit of creditors.  Buyer will have no obligation to Seller under subsection (b) or (c) above if Buyer terminates its purchase obligations of a Purchase Order pursuant to this subsection (e).

(f)  A Purchase Order may be terminated immediately in the event of a default by the Seller. Buyer will have no obligation to Seller under subsection (b) or (c) above if Buyer terminates its purchase obligations of a Purchase Order because of a default by Seller.

(g)  Upon receipt of the notice of termination, Seller, unless otherwise directed by Buyer, will (i) terminate promptly all work under a Purchase Order; (ii) transfer title and deliver to Buyer or its designee the finished work, the work in process, and the parts and materials which Seller produced or acquired in accordance with a Purchase Order and which Seller cannot use in producing goods for itself or for others; (iii) verify/settle all claims by

subcontractors for actual costs that are rendered unrecoverable by such termination and provided the recovery of materials in Seller's possession is ensured; (iv) take actions reasonably necessary to protect property in Seller's possession in which Buyer has an interest until disposal instruction from Buyer has been received; and (v) upon Buyer's reasonable request, cooperate with Buyer in effecting resourcing production of the Supplier to a different supplier.

## 25. CUSTOMER REQUIREMENTS

Seller agrees to comply with the applicable terms and conditions of any agreements ("Customer Purchase Orders") received by Buyer from a third party ("Customer"), in which Buyer agrees to supply to Customer, or incorporate into goods supplied to Customer, Supplies purchased by Buyer from Seller. Buyer may supply Seller with information regarding the Customer Purchase Orders, but Seller shall be responsible for ascertaining any terms and conditions contained in Customer Purchase Orders that may affect Seller's obligations under a Purchase Order. Seller will do everything within its control to enable Buyer to meet the terms and conditions of the Customer Purchase Orders. If this Section conflicts with any other paragraph in a Purchase Order, Buyer has the right to have the provisions of this Section prevail.

## 26. COMPLIANCE WITH LAW

(a) ACH serves from time to time as a contractor for the United States government. The policy of the United States government expressed in Pub. L. 95-507, that small business concerns and small disadvantaged business concerns will have the maximum practicable opportunity to participate in performing contracts of the United States government, and its clause entitled "Utilization of Small Business Concerns and Small Business Concerns Owned and Controlled by Socially and Economically Disadvantaged Individuals," apply to ACH and its U.S. suppliers. A copy of the foregoing clause is available from ACH upon request.

(b) If ACH or any U.S. subsidiary, joint venture, or other Associated Company or operation located in the U.S. is the Buyer, and Seller is a U.S. entity, Seller will comply with federal laws, rules, and regulations applicable to subcontractors of government contractors, including those relating to contracting with small and disadvantaged business concerns (Pub. L. 95-507); equal employment opportunity and affirmative action in the employment of minorities (Executive Order 11246); women (Executive Order 11375), the handicapped (29 USC 793), and certain veterans (38 USC 4212); contracting with business concerns operating in areas of surplus labor (41 CFR 1-1.805); and contracting with women-owned business concerns (Executive Order 12138).

(c) Seller and the Supplies shall comply with applicable laws, rules, regulations, orders, conventions, ordinances or standards of the country of destination or which relate to the manufacture, labeling, transportation, importation, licensing, approval or certification of the Supplies, including those relating to environmental matters, wages, hours, and conditions of employment, subcontractor selection, discrimination, occupational health/safety, motor vehicle safety, NAFTA and any other similar trade agreements. A Purchase Order incorporates by reference all clauses required by these laws. At Buyer's request, Seller shall certify in writing its compliance and/or willingness to cooperate with any or all of the

foregoing. Seller represents that any Supplies purchased by Buyer under a Purchase Order will not be produced with forced labor either by Seller or Seller's Suppliers. Seller shall indemnify Buyer against any liability Buyer may incur if this representation is incorrect. Buyer requires strict compliance with this provision and has the right to immediately terminate a Purchase Order if there is a breach hereof.

(d)    For Supplies shipped to European destinations Seller will notify Buyer of the 'Classification of Dangerous Goods' in conformity with the "European Agreement concerning the International Carriage of Dangerous Goods" prior to the first delivery of such Supplies.

(e)  Seller will indemnify Buyer against and hold Buyer harmless from any liability, claims, demands, or expenses (including attorney's fees and other professional fees, settlements and judgments) relating to Seller's noncompliance with any of the foregoing clauses of this Section.

## 27.  CHOICE OF FORUM; APPLICABLE LAW

(a) All disputes between the parties, including those arising, directly or indirectly, under this Purchase Order or the performance or breach of this Purchase Order, shall be adjudicated exclusively in the Circuit Court for the County of Wayne, State of Michigan or, if subject matter jurisdiction exists, the U.S. District Court for the Eastern District of Michigan. The parties stipulate that the referenced venues are convenient. All disputes between the parties and this Purchase Order will be construed, governed and controlled in all respects by the laws of the State of Michigan. The UN Convention for the International Sale of Goods is expressly excluded.

(b) In the event that the Seller is located outside of the United States, then Buyer shall have the option of submitting any dispute, controversy or claim arising under this Purchase Order or otherwise to binding arbitration. Such arbitration will take place before one arbitrator in accordance with the Commercial Arbitration Rules of the American Arbitration Association and shall take place in the City of Detroit, State of Michigan. The arbitration award may be entered as a final judgment in any court of competent jurisdiction. The Federal Arbitration Act, 9 USC §1, *et seq.* will apply to the application and interpretation of this arbitration provision.

**Supplemental Provisions Applicable to Tooling**

## 28.  TOOLING ORDER

If Buyer issues a Tooling Purchase Order, Seller will design and fabricate, rework or acquire from such sources as Buyer has given prior approval, and install the tools, dies, fixtures, molds or patterns, described in such Tooling Order ("Tooling"), subject to the terms and conditions contained herein.

## 29.  SAMPLES, STATUS

Seller shall, at its own expense, manufacture a reasonable number of sample parts on the Tooling for inspection and/or testing by Buyer to ensure the capability of the Tooling to

produce parts which meet Buyer's quality standard QS9000 and TS16949. In addition to Seller's obligations under Section 12 (a), to the extent technically feasible, the Tooling shall be designed and fabricated to be sufficiently durable to support the manufacture of all production and service requirements through the production lifetime of the part and also permit the production of Buyer's subsequent service-only requirements. The Tooling will be deemed to be completed when the necessary samples have been submitted and approved by Buyer. Buyer may request Seller to furnish semi-monthly (or more frequently at Buyer's option) status reports on the construction and acquisition of the Tooling. Each status report shall identify the Tooling, identify the subcontractors working on the Tooling, and designate the percentage of completion of the work. Seller will notify Buyer immediately upon becoming aware that the Tooling may not be completed by the completion date specified on the Tooling Purchase Order and Seller shall furnish to Buyer a schedule of the actions that Seller will take, at Seller's expense, to achieve completion on the specified completion date.

30. TITLE, IDENTIFICATION

In the event that Buyer issues a Tooling Purchase Order, all right, title, and interest in and to any part of the Tooling, including any and all designs, drawings, specifications, spare parts, trial parts and ancillary products, shall pass to Buyer as soon as it is acquired or fabricated in accordance with a Tooling Purchase Order or other written documentation issued by Buyer. During the term of a Purchase Order, all such Buyer-owned Tooling in the possession of Seller shall be deemed to be Bailed Property and shall not be deemed to be a fixture or a part of Seller's real property. Seller expressly waives and releases any and all statutory, equitable or other liens, including but not limited to any molder liens, special tool liens, builder liens and the like, that Seller has or might have on or in connection with the Buyer-owned Tooling for any and all work, including but not limited to, designing, manufacturing, improving, maintaining, servicing, using, assembling, fabricating or developing the Buyer-owned Tooling. Seller hereby agrees to indemnify, defend and hold Buyer harmless from and against any loss, liabilities, costs, expenses, suits, actions, claims and all other obligations and proceedings, including without limitation all attorney's fees and any other cost of litigation that are in any way related to releasing, terminating or otherwise removing any such liens placed on the Buyer-owned Tooling, including any such liens filed by a third party. Seller will (i) properly house and maintain such property on Seller's premises; (ii) prominently mark it Property of Buyer; (iii) refrain from commingling it with the property of Seller or with that of a third party; (iv) adequately insure it against loss or damage; and (v) not move it to another location whether owned by Seller or a third party, without the prior written consent of Buyer, except in the case of an emergency. Seller may move the Tooling property provided that it gives Buyer notice that the Tooling has been moved and the location of the Tooling as soon as reasonably practicable. Seller shall indemnify Buyer against any claim adverse to Buyer's ownership of the Buyer-owned Tooling, except as such claims may result from any acts or omissions of Buyer. To the extent permitted by law, Seller waives its right to object to the repossession of the Buyer-owned Tooling by Buyer in the event Seller initiates or is otherwise involved in bankruptcy proceedings. While in its possession, Seller, at Seller's expense, shall maintain the Buyer-owned Tooling in first class condition and immediately replace any items which are lost or destroyed or become worn out. All repaired or replaced Buyer-owned Tooling shall be the property of Buyer. Wear and repair of the Buyer-owned Tooling is Seller's responsibility. Title to any modifications, changes or accessions to Buyer-owned Tooling shall vest in Buyer regardless of whether Buyer has reimbursed Seller for such

modification, changes or accessions. Seller shall keep such records in relation to the Buyer-owned Tooling as Buyer may reasonably require. None of the Buyer-owned Tooling shall be used in the production, manufacture or design of any goods or materials except to the order of Buyer. Seller shall not sell or otherwise dispose of any product using Buyer-owned Tooling to any party other than Buyer except where specifically authorized by Buyer in writing. Seller's responsibility continues beyond the expiry date of the related parts Purchase Order. If the Buyer-owned Tooling is not utilized to produce any parts for Buyer for a period of two years, Seller shall so notify Buyer and request instructions as to the disposition of the Buyer-owned Tooling. If Seller subcontracts all or any portion of the manufacture of the Buyer-owned Tooling, Seller shall so notify Buyer in advance and obtain for Buyer all of the rights contained in this Section 30 and such other documentation as Buyer may require from each such subcontractor used by Seller.

## 31. TOOLING INVOICES, PAYMENT

(a)    Payment for Buyer-owned Tooling will be made after approval of the PSW (Part Submission Warrant) and in accordance with Buyer's standard/normal payment terms unless stated otherwise in a Tooling Purchase Order or other written authorization issued by Buyer.

(b)   If a Tooling Purchase Order designates that it is non-competitively placed or based on affordable targets, Buyer's payment obligation shall be no more than the specified maximum, if any, for (i) Seller's actual costs for purchased materials and services (including purchased Tooling and portions thereof); and (ii) Seller's actual cost for direct labor and overhead. Seller shall establish a reasonable accounting system that enables ready identification of Seller's cost. Buyer may audit Seller's records, at any time prior to two (2) years after final payment, to verify Buyer's payment obligation to Seller.

(c)  To the extent permitted by applicable law, any payments made by Buyer for Buyer-owned Tooling are expressly intended by Buyer to be held in trust for the benefit of any subcontractor(s) used by Seller to produce the Buyer-owned Tooling that are covered by such payments and Seller agrees to hold such payments as trustee in express trust for such subcontractors until Seller has paid the subcontractors in full for the Buyer-owned Tooling. Seller acknowledges and agrees that its subcontractor is an intended third party beneficiary of the terms of this section relating to the express trust and as such, the tooling subcontractors shall have the right to enforce these terms directly against Seller in their own name. Seller agrees that Buyer has no obligation to Seller or Seller's tooling subcontractor under this section other than making the payment to Seller in accordance with a Tooling Purchase Order. In the event Seller's tooling subcontractor brings an action against Seller under this section, Seller agrees that it will not join Buyer in any such action.

## 32. PROVISIONS APPLICABLE TO SELLER-OWNED TOOLING

If Seller has been notified that the special tooling required to support production of Supplies for this Purchase Order is to be funded by Seller ("Seller-owned Tooling"), the following provisions shall apply:

(a) Seller acknowledges that the Purchase Order price includes a cost element to help Seller recover the capitalization of Seller-owned Tooling. The Seller-owned Tooling will be properly

maintained by the Seller at its own expense for so long as the Supplies are purchased by Buyer for its serial production as well as for its service and replacement part requirements.

(b)  If Seller uses the Seller-owned Tooling to produce the Supplies for other customers, including aftermarket customers, such Supplies shall not incorporate any of Buyer's logos, trademarks, tradenames or unique part numbers.  Seller shall not disclose or imply in its marketing efforts that the Supplies are equivalent to those purchased from Seller by Buyer or any of its Associated Companies.  Seller shall indemnify and hold Buyer (including its employees) harmless from and against any claim, expense, loss or liability arising out of its sale of Supplies to other customers or caused by or resulting from defects in design, materials or workmanship of the Supplies sold to such customers; the failure of Seller (or its subcontractors) to fully comply with applicable federal, state, provincial, or local laws, statutes, regulations or governmental directives which regulate the sale of Supplies to such customers; and from any and all claims, suits and liability for loss of or damage to any tangible property or persons (including death) caused by any act or omission, including negligent or willful conduct of Seller or its subcontractors, arising out of such sales of Supplies to other customers.

(c)  In consideration of Buyer's Purchase Order for parts to be produced from the Seller-owned Tooling, Seller grants Buyer an exclusive, irrevocable option to purchase Seller-owned Tooling by paying the lesser of the outstanding unrecovered capitalization or the fair market value at the time Buyer exercises the option.  Buyer may exercise this option at any time and in the event of termination or expiration of this Purchase Order, and upon such exercise by Buyer, Seller will cooperate with Buyer's removal of the property from Seller's premises.  If Seller finances any portion of the Seller-owned Tooling, Seller will obtain for Buyer the rights granted in this subsection (c) from its financing source.

### III.  **CONCLUSION**

For the foregoing reasons, ACH asks this Court to grant its motion to implead Solutia as a third-party defendant in this case.

CONNOLLY BOVE LODGE & HUTZ LLP

*/s/ Collins J. Seitz, Jr.*
Collins J. Seitz, Jr. (#2237)
Kevin F. Brady  (#2248)
**CONNOLLY BOVE LODGE & HUTZ LLP**
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE  19899
Tel: (302) 658-9141

*Attorneys for Defendant/Counter-Plaintiff/Third-Party Plaintiff*

OF COUNSEL:

Ernie L. Brooks   (P22875)
Frank A. Angileri  (P45611)
Brian S. Tobin  (P67621)
**BROOKS KUSHMAN P.C.**
1000 Town Center
Twenty-Second Floor
Southfield, Michigan 48075-1238
Tel:  (248) 358-4400
Fax:  (248) 358-3351
Email: ebrooks@brookskushman.com
        fangileri@brookskushman.com
        btobin@brookskushman.com

DATED: March 30, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2007, I electronically served the foregoing

document by using CM/ECF to counsel of record as follows:


Richard L. Horwitz, Esquire
David E. Moore, Esquire
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899-0951


and by first class mail to:

Arthur I. Neustadt
Jean-Paul Lavalleye
Aarti Shah
**OBLON SPIVAK McCLELLAND
    MAIER & NEUSTADT, P.C.**
1940 Duke Street
Alexandria, VA 22314


                              */s/ Collins J. Seitz, Jr.*
                                Collins J. Seitz, Jr. (#2237)
                                CONNOLLY BOVE LODGE & HUTZ LLP
                                1007 N. Orange Street
                                P.O. Box 2207
                                Wilmington, DE  19899